The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. You may be seated. Welcome, everyone, to the Fourth Circuit, our last sitting of the court term, and Judge Benjamin and I would especially like to welcome our newest Judge Berner to her inaugural panel sitting. So with that, we're going to hear three cases today. The first is Shook v. NCG Acquisition. Whenever you're ready, Mr. Hoff. Good morning, and may it please the Court. My name is Chris Hoff, and I represent the plaintiffs' appellants, Kim Shook, Kylie Scolaro-Conti, and John Swid, three substance abuse counselors who were formerly employed by the agency, APLE, in the mountains of Western North Carolina. Plaintiffs were part of what's called a Substance Abuse Intensive Outpatient Program Team, acronym is SAIOP. We're asking the Court to reinstate plaintiff's claim for wrongful discharge in violation of North Carolina public policy, which was dismissed by the district court for failure to state a claim pursuant to Rule 12b-6. First, plaintiffs are not asking the Court to expand North Carolina's public policy. We're simply asking the Court to interpret. To follow the public policy, right? That's correct, Your Honor. The North Carolina General Assembly expressed the public policy in question through the North Carolina Substance Use Disorder Professional Practices Act, acronym SUDPA, S-U-D-P-P-A, which authorized the creation of the ethical principles of conduct. But what about the fact that this is also at-will employment? And isn't the public policy exception fairly narrow? That's correct, Your Honor. But following the North Carolina Court of Appeals decision in Dearman v. Beverly, California Corp., if you look at the administrative code regulations in question, which are part of the ethical principles of conduct for the substance abuse professional, it's our position that the ethical principles are analogous to the regulations that were created pursuant to the authority under the Nursing Practices Act, which was the statute and regulatory scheme at issue in the Dearman case. And if you look at the regulations that are at issue here and that were cited and pled in the complaint, there's two primary sections. One is entitled Competence. That's 21 Administrative Code 68-503. And the other one is Client Welfare, 21 Administrative Code 68-507. Are you relying on specific subsections of those regulations or the regulations as a whole? Specific subsections that are referred to both in the complaint and in our briefing, those subsections, and notably each of them includes a shall. The substance use disorder professional shall complete reports and record-keeping functions in a manner that supports the client's treatment, experience, and welfare. And that's 503H. And then the complaint generally cites the section on client welfare, which is 507. And that includes the substance use disorder professional shall protect the safety and welfare of the client. And that's 507A, as well as 507C, the substance use disorder professional. Wouldn't we be stepping on the toes of the North Carolina legislature if we find a cause of action here? I think that's what the other side, one of the things they will argue. Absolutely, Your Honor. And the North Carolina General Assembly enacted SUDPA. And under the authority of that statute, these ethical principles were created. And we believe that simply this court would be interpreting public policy that's already been expressed by the North Carolina General Assembly. So rather than stepping on their toes, we would be carrying out what the legislature has put in place? Yes, Your Honor. That's our position. And if you look at the Dearman case, which I think is really the only case kind of going either way from North Carolina's appellate courts, that is really similar to this case. Because most wrongful discharge cases, if you look at them, they involve situations where someone is actually refusing to break the law, like refusing to work for less than minimum wage, refusing to violate highway regulations, things of that nature. In this case, as well as in Dearman, the North Carolina Court of Appeals decision, it's alleged in the complaint, plausibly we contend, that plaintiffs were terminated because they were complying with minimum standards of patient care for a substance abuse professional. Under the statute and regulations that is discussed already here today, as well as in our briefing. So if your clients had not taken the actions that they had taken, are you suggesting they would have lost their license to practice or been no longer qualified to practice? Were these requirements of their job? Yes, it is. I don't, you know, it's hard for me to hypothesize what exactly would have happened to them if they had not pursued the avenues that they did. First, pushing for the client to be admitted to inpatient care when, with the support of the client's parole officer, it was clear that the client was spiraling out of control, using meth, and was a danger to herself and needed inpatient care. But it's clear, it appears from the record, your clients professionally did what they were supposed to do, correct? Yes, Your Honor. So your issue is the reporting of someone else not doing what they were supposed to do? Well, it's both, Your Honor. They were complying with the regulations. They were doing what they were supposed to do in maintaining the minimum standards of a substance abuse professional as required by the regulations. And took it to their supervisor, Ms. Toole, and said, hey, we've got a client who's in danger. This person needs inpatient care. Push, push, push. And when that didn't happen, then went to Ms. Toole's supervisor, Mr. Ross, and said, you know, Ms. Toole is putting clients in danger by refusing to, you know, give the necessary letter that would have put the patient into inpatient care and, you know, potentially saved her life, as is alleged in the complaint. So it really is all of the things that they were doing to take care of their client, and then when that didn't work, taking the next step to complain to Ms. Toole's supervisor. And then they were ultimately terminated. And it is alleged in the complaint, and it's our position, that all of those things were required by the regulatory scheme that governs substance abuse professionals in North Carolina. And the complaint plausibly alleges that the agency terminated plaintiffs because they took those steps that they were required to take by the regulations and statute that governs their profession. Just as in Dierman. And, you know, the Dierman court noted that we perceive no legally cognizable distinction between the foregoing circumstance, which is, as I described earlier, what's often in these cases is the plaintiffs being terminated for refusing to violate a law, a statute of regulation. And the allegation that plaintiff was terminated solely for the reason that she complied with statutorily and administratively prescribed minimal competency standards. So in Dierman, it was a statute and regulations governing the nursing profession. Here, it's statute and regulations governing substance use disorder professionals. They're very similar. If TOOL changed the letter from higher level of care for the client to different level of care, why does that make a difference, if it does? Yes, Your Honor. Paragraph 27 of the complaint, that's on Joint Appendix page 13, it is alleged, TOOL resisted the SAIOP's team's recommendation from the outset, such as by changing the recommendation from a higher level of care to merely a different level of care, which was not clinically indicated for the client's acute condition. Under the standards promulgated by the American Society of Addiction Medicine, a higher level of care after intensive outpatient care, i.e. SAIOP, which is level 2, is a residential inpatient hospitalization or level 3 care. And the next paragraph of the complaint, paragraph 28, says a different level of care was not sufficient to order inpatient hospitalization, which it's alleged in the complaint. So what TOOL changed it to, a different level of care, wasn't specific enough to get the kind of treatment that the counselors felt the client needed. Is that correct? Yes, Your Honor. It is alleged in the complaint that the parole officer, so the SAIOP team, of which my clients were a part, plaintiffs were a part, went to the parole officer. They were working together trying to get the client into inpatient care because they believed that she was at risk of overdosing and she wasn't going along with any of the treatment. And in order to get her into inpatient care, it is alleged in paragraph 27 and 28 of the complaint, as well as I think some other places, that certainly paragraph 1 of the complaint, which is one of the three paragraphs of introduction, that they needed a letter from a supervisor, from a director, Ms. TOOL was an assistant director, saying that the client needed to go to, needed a higher level of care. A different level of care was not sufficient, which is specifically alleged in paragraphs 27 and 28. And the agency in its response brief... They say that it's the same thing. They say that higher level and different level are the same thing. But for a different level of care, if that recommendation is made, I'm assuming that that means that not necessarily inpatient, but it could be a different substance abuse counseling or some different services, but not necessarily inpatient, right? Yes, Your Honor. It was some other services, and that is not, you know, we're really, the record is really limited to the complaint here, and it's unclear exactly what those services would have been, but it would not have included inpatient care, which was what my clients believed was required in order to... Could appellants have sent the letter on their own, or did they need TOOL's signature? It is alleged in your complaint, Your Honor, that they needed TOOL's signature in order to get the client into inpatient care, which is what they believed that they needed to do in order to... And what probation needed. And what the probation officer needed. So you're relying on this provision that requires them to protect the welfare of their clients, right? In the regulation, they are required to protect the welfare of their clients? Yes, Your Honor. It's a sort of series of provisions involving competence and client welfare. So couldn't their supervisor have disagreed on what's in the best interest to protect the client? Couldn't reasonable professional minds disagree, and the supervisor just simply disagree that this inpatient care is the best next step? Yes, Your Honor, absolutely. We're here on a Rule 12b-6 motion, and the question is whether the complaint plausibly alleges a wrongful discharge claim in violation of North Carolina's public policy, and it is alleged that the agency terminated my client. So I think to Your Honor's point, if we were here on summary judgment or following a trial, and there were sort of questions of fact involved, then absolutely, there can be fact questions, and I anticipate that's what we're looking for. So I think to Your Honor's point, if we were here on summary judgment or following a trial, and there were questions of fact involved, then absolutely, there can be fact questions, and I anticipate that's what we're looking for. The fact is a question of fact for the jury, and that is not cited in the briefing, and I do quickly have a Bumgarner v. Spotless Enterprises. That's a Western District of North Carolina case from 2003, 287 Federal Supplement, 2nd, 630. So just to add that into the record, I see my time is almost up. Is that case also in your brief? It is not, Your Honor. Okay, did you provide opposing counsel with a copy of the case you just cited? I have not, Your Honor. You need to do that. I will do so immediately after the argument, Your Honor. And then if Mr. Anderson, if you feel like you need to file a letter in response to whatever this case is, you can do that as well. All right, thank you. We'll hear from Mr. Anderson now. May it please the Court, Matthew Anderson here on behalf of NCG Acquisition LLC, which is commonly referred to as NCG. As the honorable judges are well aware, this is a case about a claim for termination violation of North Carolina public policy. This is an incredibly narrow exception to at-will employment, and it's only granted when it's been explicitly created by the legislature or North Carolina courts. Well, what about the Dierman case? How can you get around that one? Which at least seems to me to be pretty squarely on point here. Yes, thank you, Your Honor. So the Dierman case, the key issue there was the plaintiff was terminated because she counseled a patient, actually a patient's family, that that patient should change treating providers. And the Nursing Practices Act, while it is similar in its purpose, public policy purpose, of protecting the welfare and creating minimum competency standards, the difference was that the Nursing Practices Act required Ms. Dierman to provide care, counsel, teach, implement, and implement prescribed treatment. So basically in Dierman they're saying it was her professional obligation to do so. Correct. How is that different than 507 under client welfare where it says the substance use disorder professionals shall protect the safety and welfare of the client? I believe that they are similar, but I think the key difference here is understanding the acts in question that led to the termination. I think that's where the differentiation comes. In Dierman, the plaintiff was terminated for specifically providing this advice to a patient's family. Here, while we have discussed already the nuances of different versus higher level of care, plaintiff's or appellant's termination stemmed from their complaining to Mr. Ross that Ms. Toole made the change, and in fact suggesting that that change from higher to different killed the patient. And NCG undertook an investigation, and as alleged in the complaint, messages between appellants were part of that investigation, and when NCG terminated the appellants, as alleged in the complaint, those messages were the cause. Let me ask you this, because the appellant's argument is that these are different levels of care. And I believe in your brief, you just said, oh, it's just different wording. It's different versus higher. Would you agree that these are different levels of care, that a different level of care and a higher level of care, and I used the word different again, but are two different standards of care? My understanding, Your Honor, and I'm not a substance abuse disorder professional, but as a lay person, I would understand that different encompasses different levels of care. Different encompasses higher, similar to all bears are fierce wild animals, but not all fierce wild animals are bears. Okay, so different might encompass higher, but it also could encompass lower, and that's not what they were after. They were after a specific higher level of care in the best interest of their client, in their view and in the view of the probation officer. So I'm not sure that helps you. Well, Your Honor, so I think going back to kind of the acts that led up to the termination. Again, Dearman was terminated for acts that were required by the nursing practices act. So you're distinguishing Dearman by saying in Dearman, the firing there was specifically because they didn't carry out the duties that they owed under the regulations. And here, it wasn't really about not carrying out their duties, it was about complaining about their supervisor. Correct, Your Honor. But doesn't one of the regulations, 503H, require reporting, the professional shall complete reports and record keeping functions in a manner that supports the client's treatment experience and welfare? And so by reporting their supervisor, they were maintaining their professional duty to support the client's treatment experience and welfare. I believe that the magistrate got it correct when he found that the only reporting requirements, the reporting requirements, under the SUDPA were to the board that governs and there were no requirements to report to within an organization. But even in Dearman, if you look at Dearman, there was, and I think he, in the magistrate's report, the magistrate says, it says it's close. But the magistrate also says, bases his decision on this, I think it's 503, the portion of the regulations that were required under the SUDPA. The regulation that says you have to, I think it's 503E, should report to any violations to the board. But the regulation also has all of these other professional obligations in it. And so it appears that the magistrate said, well, they were supposed to report it to the board, they didn't report it to the board, they reported it to their employer, and that's not protected under this public policy. But that's one portion of the regulation. There are other portions of the regulation that would seem to be similar to that in Dearman, because in Dearman, she didn't report it to anyone, there was just this complaint that she told the patients, you need to get another doctor, you need to get, and so there's no reporting, she's not reporting to anyone there, either, you would agree, right? I would agree, Your Honor. Again, I would point to Dearman, there was a specific requirement of Ms. Dearman that if she did not comply with, she would have lost her license. Here, we would allege that the complaint, or we would argue that the complaint alleges that their termination arose from the complaint to Mr. Ross. So what you're saying is because they didn't report to the board, they only reported internally, this doesn't rise to the level of violation of public policy under state law, is that right? We would argue that... That's what the magistrate said. Correct, but we would argue that where the magistrate also got it correct was that it is not federal court's jobs to extrapolate or surmise state law, state public policy, and the events here are, yes, tangentially related to their obligations. Wouldn't that create an incentive for employers to terminate an individual that they believe was going to go to the board, to report to the board, to terminate them in advance of the report? I do not believe so, Your Honor. I mean, it seems to me that they know these individuals think something was done wrong. They first take an internal action, which seems to me the right thing to do, to first talk to your supervisor about it, right? And then later, actually, after they were terminated, they did go to the board, and they made the complaint to the board, and the board found there to be a violation, or at least found there to have been improper behavior. So it's fair to assume, at least based on at the pleading stage, that they were building up to going up to the board, and they were terminated in advance of that. And so, if we were to find that the termination in advance of the actual filing of the report were not in violation of public policy, wouldn't that create an incentive for employers to terminate anyone that they think is possibly going to go to the board, so they could avoid this exception to the at-will doctrine? If that were the finding, Your Honor, I believe that, yes, you could make that argument, but we would ask that the court find that it is not the federal court's job to make that argument. It is the court's job to guess what state public policy is, and how the termination violation of public policy fits into, that narrow exception fits into that public policy. And I think appellants actually hit the nail right on the head in their reply brief on page 9, when they said, just because the precise nature of the public policy at issue is not exactly the same as the issue in Dearman, I think that says it all. Because we are operating off the beaten path and attempting to extrapolate how Dearman would apply to a completely different statute, that as a federal court sitting in diversity jurisdiction, I believe respectfully that it is not this court's job to plow that road. Well, okay, so it is our job at the 12B6 stage to look at this complaint and see if it plausibly alleges a cause of action. What is your best argument that it does not? Particularly considering that I believe you can see that the three regulations are the public policy of North Carolina, correct? Correct, Your Honor. The SUDPA's purpose is to ensure that only qualified individuals provide substance abuse counseling. At the time of their termination, the appellants did not make any such allegations. Their educational licensing required standards for these professionals. The appellants did not make any claim that Ms. Toole was not properly licensed. And there is a duty to protect the policy. What about the allegations in the complaint? What is the problem with this complaint that it cannot get beyond 12B6? The problem with the complaint is that when you take all of the alleged facts and the reasonable inferences from those facts, appellants were terminated for their complaint about the debate between the two. It was about a different and higher level of care. We would argue that there is no public policy. They were right about that in the end, weren't they? The paragraph 46 of the complaint alleges that DHHS actually found that Toole was the one in the wrong, correct? That is correct. But at the time of their termination, that had not been decided. That came well after the termination. And so hindsight is 20-20. But there is a difference between a different level of care and a higher level of care. Yes. Professionally. One is more specific and one is broader. And one requires inpatient treatment and one does not require inpatient treatment. That is not my understanding. My understanding is both can include inpatient treatment. Higher specifically requires inpatient treatment, while different could also include inpatient treatment. Or not. Or not. Which was the problem here. It could have been the problem. Ended up it was the problem, though. The patient overdosed. Correct, Your Honor. But we would also like to point out that this debate between the appellants and Ms. Toole went on for 11 days with a supposed crisis for the appellant. And I think that is an important fact to note. Why is that an important fact? Again, if we are taking all of the allegations in the complaint, if this is an important fact, then it is an important fact. But Ms. Toole went on as a supposed crisis and appellants were truly looking out for the welfare of their patient, sitting on this letter for nearly two weeks. Toole sat on the letter for two weeks? Ms. Toole and appellants. As they allege in the, if I can find the... So I think I asked opposing counsel something like why didn't they just go ahead and send the letter? Are you saying that the counselors could have sent the letter or taken some action absent Toole's supervision? They could have accepted the change and submitted the letter and dealt with what was needed to be dealt with after they sent that letter. But I thought you said the letter, different level of care does not necessarily include higher level of care. It could, but it could also include a lot of other things. So it wouldn't have gotten to the end point that they needed. That is not alleged in the complaint. In fact, nowhere in the complaint is there an allegation that Ms. Toole changed the ultimate recommendation of inpatient hospitalization. And notably, appellants never attached this alleged letter to the complaint. And so we cannot surmise or guess whether or hypothesize that Ms. Toole changed the letter. We cannot hypothesize as to whether, if they had submitted the letter as Toole edited it, the patient would not have received inpatient. Well, I mean, of course, we're at a 12B6 stage. So I would assume that their argument is going to be all of that would have been hashed out in discovery and handled maybe at a summer judgment motion. I'm sure that will be their argument. Thank you. I'm curious, what is your, I guess, your position or your client's position as to the reason that they were terminated? Because you would agree that there was one reason initially given and then another reason was given. What was the, I guess, official reason as to why they were terminated? The messages that were reviewed as part of the internal investigation into the complaint. As they were alleged in the complaint, if I can point your attention to Joint Appendix 15. While in 38, 39, and 41, the NCG made it clear that the internal messages were part of, were the reason for the termination. Obviously, why they were problematic shifts from HIPAA to causing concern, attitudes and observations observed toward the discussion about the clinical care of the client and disregard for following protocols. These are the facts as alleged in the complaint. Again, NCG would maintain that that is a clear reason for termination. Those messages do not implicate the public policy at issue. I think your colleague would say that his clients were protecting client welfare in sending those messages and that they were required to do so. Were they not required to do so? They were, but I would then state attitudes absorbed toward the discussion about clinical care and disregard for following protocols would actually not be looking out for their clients' welfare. Isn't that a question of fact, not appropriate at this stage? Yes, Your Honor. I see that my time is coming to an end. There are a few things that I think the Court should be cognizant of. The main thing is that appellants decided to file this claim in federal court based solely on diversity jurisdiction. They knew that this claim would revolve entirely around finding of a state public policy. How that public policy was articulated by courts and legislatures and how their actions fit into that public policy and whether those actions were protected by that public policy and therefore making their termination wrongful. I don't think that should go unnoticed because as we have discussed already, the Erie Doctrine requires that federal courts apply state law as it exists. Turn the Court's attention to the Washington v. Union Carbide Court case, which was in our briefing, where the Court found that there was no clear public policy protecting internal complaints to private employers. We would argue that that is the same here under SUDPA. There is no clear public policy protecting internal complaints. While there may be, there is nothing from North Carolina courts or the legislature or the regulating bodies that clearly protect internal reports for co-worker disputes. We would posit that if the appellants had wanted to expand state law, then they should have filed in state court. This expansion to cover facts here is at risk of essentially swallowing the at-will employment doctrine of the Court. We would argue that that is not the case entirely because if we start here with co-worker disputes under SUDPA being protected by public policy, then we run the risk of chilling an employer's ability to deal with any sort of co-worker disputes through termination, addressing toxicity in the workplace. For those reasons, we would ask the Court respectfully to stay on the paved road here and find that North Carolina public policy does not clearly articulate that complaining to your supervisor's supervisor about your supervisor's actions are not protected by public policy. I can cede the rest of my time unless the Court has any additional questions. Thank you, Mr. Anderson. You have five minutes. Thank you, Your Honor. I will begin by reading from paragraph 28, joint appendix 13 of the complaint. In multiple communications between March 25, 2021 and April 2, 2021, the SAIOP team attempted to get TOOL to approve the complaint. They reported that TOOL had not approved the complaint and co-signed the letter recommending a higher level of care, but TOOL would not do it. Instead, she arbitrarily agreed to recommend only a different level of care, which was not clinically indicated or sufficient for the probation officer or a federal court to order hospitalization. Even after three attempts by the probation officer to secure the recommendation from the agency in writing, TOOL would not agree. Fearing the consequences, Shook pleaded with TOOL saying, using meth, staying up all night makes it really hard to attend treatment. Why would the agency sugarcoat this recommendation only to allow the client to continue in a disease that can lead to death or imprisonment? And now opposing counsel says that you haven't alleged that TOOL changed the ultimate recommendation with that wording change. What is your response to that? Yes, Your Honor, as well as the preceding paragraph of the complaint, paragraph 27, taken as true and all inferences in favor of my clients. I'm obviously biased, but in my view, it's fairly clear that what TOOL was doing and refusing to change the recommendation was a mistake. It was a mistake to get the client into inpatient care and I'm only representing plaintiffs on appeal. That police says you don't belong in federal court. Would you like to respond to that? Yes, Your Honor, I did not represent and do not represent plaintiffs in district court and I do not know exactly what this was about. I don't know what the sort of thinking was behind bringing this, there were originally two claims, one of which was also dismissed and has not been pursued on appeal, bringing these state law claims in federal court. I thought we were here under diversity jurisdiction. Yes, Your Honor, yes. And was jurisdiction challenged below? No, Your Honor, I think jurisdiction is proper and not in dispute pursuant to 28 U.S.C. 1332, which is the statute of limitations. Congress has authorized federal courts to hear state law claims when there's complete diversity between the parties and the amount in dispute is over $75,000, as Your Honors are well aware. And again, we're not asking the court to expand public policy. The agency's conceded that both SUDPA and the administrative code express North Carolina's public policy, so we're simply here asking the court to expand public policy. We're simply asking the court to interpret that public policy in the context of the well-pled allegations in the complaint. I think what your colleague is saying is that any time there's a pleading in a regulated workplace, a workplace that's regulated by public policy, that there was a difference of opinion about how to comply with the law, then that would necessarily survive a motion to dismiss. That seems to me a really big exception to the Atwell doctrine. Yes, Your Honor, I would point the court to the last paragraph of the Dierman decision, which addresses that question. And it says, prior to concluding, we also briefly addressed defendant's assertion that a decision such as that reached herein might be extended to any employment regulated or licensed by the state. To the contrary, our ruling is in keeping with the underlying purpose of recognizing public policy exceptions only in instances of substantial discrimination. And to the contrary, our ruling is in keeping with the underlying purpose of recognizing public policy exceptions only in instances of substantial justification grounded in compelling considerations of public policy. The public policy recognized herein, the protection of public safety and health by ensuring a competent level of nursing care is equally as compelling as that acknowledged in Komen, namely the protection of persons and property on or near public highways. And it's our position that the public policy concerns here with regards to patient-client care in the context of substance abuse counselors is equally as compelling as that acknowledged in Komen. And it's our position that the public policy concerns here with regards to patient-client care in the context of substance abuse counselors is equally as compelling as that acknowledged in Komen. Unless the court has anything further, I'll sit down.
judges: Stephanie D. Thacker, DeAndrea Gist Benjamin, Nicole G. Berner